C1.G v. Siegfried, No. 201320. Counsel, you may proceed. Good morning, Your Honors. My name is Jamie Hubbard, and I proudly represent Appellant C.G. May it please the Court. We are here today because a 15-year-old's juvenile attempt at dark humor posted to his private social media page on a Friday night away from school resulted in his expulsion from Cherry Creek High School. C.G. was in a thrift store with friends when he snapped a photograph of three of his friends smiling, wearing silly wigs. Inspired by a hat worn by one of his friends that came from the World War II era, C.G. made the unfortunate decision to caption the photo with a hashtag fashioned after a popular meme. It said, hashtag me and the boys about to exterminate the Jews. A friend of his took a screenshot of that social media post, showed it to her parents who sent it to Cherry Creek School. C.G. was expelled, first suspended, and then expelled for this protected speech. C.G. sued the school district and the individual personnel involved in the decision to expel him, and the district court dismissed that decision on First Amendment grounds, finding, using a straightforward application of the Tinker Substantial Disruption Standard, finding that the school district had reasonably forecast a substantial disruption. Given the Mahanoy decision from last summer, the district court's decision cannot stand. Counsel, could the school officials have expelled C.G. if the speech had occurred on campus? I think under the Tinker Substantial Disruption Standard, that would certainly apply if the speech had occurred on campus. I think then the question would be whether there was substantial disruption or whether the school district had reasonably forecast a substantial disruption. On the record currently before the court, given that this was decided on a 12B6, I believe the answer would be no, the motion to dismiss should have been denied. But further on into the case, if the right circumstances were proven by the district that there was a disruption or there was a reasonable forecast of a disruption under the Tinker Standard, the school certainly could have regulated the on-campus speech. Well, just let me follow up on that. One thing we do have in the record at the 12B6 stage was an e-mail from one of the parents that came in I think the Sunday after the Snapchat posting. And one thing it mentioned was that parent's student's concern about coming to the school based on the post and also a past anti-Semitic incident at the school. Why doesn't that together, the post and the past incident, be enough to justify discipline under Mahoney or Tinker? So after Mahoney, then there's an open question. I believe the court clearly held that Tinker is the wrong standard, and the court cannot just look at the substantial disruption. But to clarify the factual record, that e-mail is in the record, and the court can consider the fact that the e-mail was sent. But I do not believe the court can consider what the parent says in that e-mail as being true. Because it's not true. There is not an established history of anti-Semitic behavior. And in fact, at the expulsion hearing, the school district dispelled the notions that the parent expresses in that e-mail and says the parent misunderstands what had happened previously at the school. I thought the assistant principal at the expulsion hearing said that students did fear coming to the school. Isn't that part of the record? There was no finding about any student fearing coming to school. Well, wasn't that even in the complaint? Wasn't that reported in the complaint? That the school had received the single e-mail. No, no, I'm talking about the expulsion hearing, where the assistant principal talked about more than one student having some fear about coming to school. I believe the assistant principal made an unsupported statement that, yes, there had been students who feared coming to school. Under the Mahanoy test, it cannot be enough that a student is offended by speech that happens outside of school. Well, it's not a student being offended. It's a student having some concern about coming to school at all. There is no record that a student failed to come to school because of the speech that happened. In fact, by the time school started on Monday, there had been a determination made by the school that there was no threat to the school or any student at the school. The CG was allowed to drive to school, park in the parking lot, carry his backpack into the school, walk through the crowded hallways to his first period class. The school, in the era of school shootings, would never have allowed that to happen if they believed there was an ounce of a threat to the school caused by CG. The police had also investigated, based on this social media speech, and determined there was no threat, there was no crime committed as a result of this post. So there is no basis to find that the speech at issue in this case is a threat. There is also no basis to find that the speech at issue in this case was harassment or bullying. Those are two of the carve-outs recognized by the Mahanoy Court, where schools may be able to reach beyond campus and reach speech that happens purely outside of school. But you would agree, wouldn't you, that those were examples given in the opinion, and the list is not exhaustive? I would agree with that. But those are the examples that we have based on the Mahanoy decision, and they don't apply here. This isn't a bullying or harassment case. The school gave no notice that they were considering this speech bullying or harassment. There was no policy cited to CG prior to the expulsion hearing that the school was concerned about bullying or harassment. Bullying and harassment is a very fact-intensive inquiry that requires the development of a factual record, and there simply isn't a record at this stage of the case to consider this speech as bullying or harassment. What about threat? There also is not a record to establish that this speech was a threat. It wasn't targeted at the school. It wasn't targeted at a teacher or another student. It was a poor attempt at a joke that was focused at a disadvantaged community, was focused at the Jewish community. It was not focused at a particular student at Cherry Creek School who happens to be Jewish. It wasn't even focused at the Jewish students at Cherry Creek. There was nothing targeted or threatening about the speech in general, and certainly nothing targeted or threatening about Cherry Creek High School. The Mahanoy decision, the reason that the Mahanoy court found that tinker cannot be the appropriate standard for when speech happens outside of school is that schools do not stand in local parenthesis for students when they aren't on campus. Parents are responsible for raising children and disciplining children when they are Friday night hanging out at a local school business, or a local business, not at school. Also, the Mahanoy court recognized that students are actually, and school children and teenagers in particular, are learning to be participants in our democracy, and that there are areas in which student speech is actually very important. If we think about school shootings, and we think about the Parkland survivors of the Marjorie Douglas Stoneman shooting down in Florida, we recognize that those students have created an entire social media movement that geared towards regulating gun rights. It happens on social media. They organize protests, voter registration. Students have to be allowed to express themselves. If the school is allowed to apply the tinker substantial disruption standard, because off-campus speech may cause a disruption in the school environment because it happens on social media, then students are silenced. And the Mahanoy court recognized that students cannot be silenced in that way. Finally... Counsel, as far as Mahanoy and your reading of it is concerned, Justice Breyer didn't say that a school's hands are completely tied when it comes to off-campus speech, did he? No, he did not. What is your read on exactly how the majority came out in that case? So I think to decide this case, this court needs to go no further than Mahanoy. That is, the speech in this case is very similar to Mahanoy, and it is enough for this court to say that schools cannot regulate purely off-campus speech that is offensive and not a threat and not bullying and harassment. I think the takeaway from Mahanoy is that it is not just a straight tinker analysis when the speech is completely away from school, and that's what the district court did here. So the district court's decision should be reversed and can be reversed on that narrow ground. From a greater policy perspective, I think the takeaway from Mahanoy is that it's not enough and the school cannot just look at whether their campus environment is likely to be disruptive because that ignores the importance of student speech that may occur off-campus that can disrupt the school environment because students speak about controversial issues and they take positions about controversial issues and that may cause discussion at school. And the fact that it causes discussion at school and may cause a school to take time away and use it as a learning process cannot be enough to allow schools to regulate the speech. There's a difference that I think is significant between this case and Mahanoy, and that is that there's no suggestion of violence in the Snapchat with respect to the cheerleader. But here, me and my friends out to exterminate the Jews, it does have an element of violence and you have a report from the teacher that some students were afraid to come to school. Isn't that a significant difference here in the facts? It is, Your Honor, and there was an investigation done to see if this was a threat. It was done by law enforcement and there was an investigation done by the school and it was determined there was no threat. I'm not asking you whether it's speech. I agree with you it's speech. If it were a true threat, we wouldn't be under the First Amendment at all. But that doesn't mean that just because it's not a true threat doesn't mean that it wasn't a component of violence that caused fear. And those facts may be developed as the case moves forward. There is not sufficient facts in the record as is currently postured in front of the court right now. Can I ask you, I've got a question about your procedural process claim. How can there be a violation for the suspensions when C.G. did not contest that he posted the Snapchat photo and message? What is more process going to do at that point when the basic facts are undisputed? So the more process is that C.G. would have been able to come forward with information showing that he was off campus. The only notice that the school gave him was that he had violated a policy that explicitly applies only to on-campus speech. There was no process given about bullying and harassment and nowhere in the process... There was no question that this was posted off campus, wasn't there? Was there any indication that this was done on campus as far as the school was concerned? No. Not that I'm aware of. And I would like to pass the rest of my time to Amiki's counsel. Good morning, your honors, and may it please the court. I am Vera Edelman, appearing on behalf of Amiki, ACLU, and ACLU of Colorado. And today I would like to focus on the standard that the district court applied below and its error in applying tinker reflexively to off-campus speech in exactly the way that it would have applied tinker to on-campus speech. And I'd like to focus on the gravity of that error and the importance of reversing it, not only for appellant here, but also for all young people who live in the Tenth Circuit. The court below clearly erred by just applying tinker in exactly the way that it would have had the speech at issue been on campus. Mahanoy clearly forecloses that, and that is enough to reverse the court below here. But it's also important to make clear that merely foreseeable disruption can't be the standard that applies to off-campus speech. If that were the case, while that rule may make sense in school, extending it off-campus would mean that students never get to have more freedom to speak than they do in the classroom or at recess. It would put protests, op-eds, just the ability to be a kid at risk. And the risks for political speech are particularly clear given that political speech is disruptive at its best. Moreover, what exactly is disruptive or foreseeably disruptive really varies by community, by school district, by school. And so opening that standard up to off-campus speech would invite constant content and viewpoint-based discrimination for what young people say. In addition, it would rob parents of control and responsibility for their kids outside of school. And as appellants' counsel said, it would make it harder for schools to prepare kids for a society in which offensive speech is protected, and they need to know how to live in it, how to respond to it, and how to change the minds that create it. The speech here is obviously dumb, and it is offensive, and it is ignorant. But that can't be enough to justify a school's discipline without more. At the end of the day, the school may be able to establish that Oh, I see that my time is up. I interrupted your time. Why don't you take one more minute? Thank you so much. It is possible that at a later stage the school may be able to establish that what happened here was harassment or bullying. But the court will have to apply a much more tailored standard to assess whether that was the case. And the motion to dismiss stage is simply far too early to make that determination. Thank you. Thank you. Thank you. Good morning, and may it please the Court, Jonathan Farrow on behalf of all the appellees. This case is about a school district's ability to maintain a safe and effective learning environment in the social media age, free from substantial disruption and harassment of other students. One Friday night off campus, Cherry Creek High School student CG posted a photo We're familiar with the facts, Counsel. Well, I want to emphasize that the post spread over the weekend. Concerned parents contacted the police and school officials. He was disciplined. We maintain that that discipline was lawful, and that CG's complaint was correctly dismissed. Did it take into account that it was dropped within an hour or two after the post with an apology? Was that taken into account? Yes. I believe that from the allegations of the complaint that you can infer that the school officials knew that information at the time they made the decision to suspend. They had already made the decision, apparently, before any hearing for this person. They didn't give him an opportunity to come in and explain how dumb he had been and that he was sorry and that he had taken the post down immediately. And apologized to everybody. They didn't give him an opportunity to do anything. Actually, Judge Kelly, I believe that the facts, as alleged by CG, show that right when he arrived at the school on Monday morning, he was escorted into the dean's office, and it was presented to him right then and there, notice that, hey, we see this post. And you're suspended for five days. And we're very concerned that this is creating a substantial disruption in the learning environment. And he sat in the office for hours. He had plenty of opportunity to explain why he posted it. How do we know that? He might have been there for hours. How do we know he had an opportunity to explain himself? I think it's a fair inference. The inferences don't go your way on a motion to dismiss. Well, and certainly he doesn't make the allegation that he never had that opportunity. Sure he does. His claim is a procedural due process claim, that he didn't have an opportunity to be heard. Well, and I think it goes down to what he defines as an opportunity. A meaningful opportunity to be heard. Well, and his idea of meaningful is something way beyond what the Constitution requires. He's expecting, you know, basically a criminal information that lays out element by element. Wait, counsel, where do you find that, that that's what he's expecting? How do you know that? Has he argued that? I think that's the thrust of the argument. Well, that's his argument. Where does he say that? Well, those aren't the exact words, but that's how I take it. Well, and I think it's pretty beyond the basic requirements of the Constitution. Do you have some notice of what the school's charges are, what the concern about your discipline is? He was told about the post and that it was being concerned for causing a disruption in the learning environment. Did he get a chance to explain what his motivation was? Did he get a chance to explain the apology? Did he get a chance to explain the context? All of those things. I mean, I don't see how you can conclude that he did not. I mean, I'm stuck with the record. Absolutely. Counsel, how can you conclude he did when there's nothing there to support what you're saying? Again, he alleged that he was. You keep coming back with inferences. Well, let's look at what he alleged. So he alleged that he was. He alleged that he that the post was brought to his attention and that it was being the school was looking into how it impacted the environment of the school. And he also alleges that he sat in the office for hours. And what he doesn't allege is that he never had the opportunity to say anything. I think that's important because, again, the test of notice and opportunity to be heard at that very first stage of the initial suspension is very minimal. It's not that he was given an opportunity to call witnesses, testify, take the stand, cross-examine, have a full-blown hearing at that stage, which, by the way, he did get subsequently. Let me ask you this. At the time of the initial suspension, as I understand the facts, there had only been one family that had connected the school and complained. Is that right? Yes, according to the allegations, that's correct. And so is that enough for a substantial disruption to suspend him at that point? Judge McHugh, I believe it's enough for a reasonable forecast of the substantial disruption, which is what the standard is and what's required. And you have to look, as I think was pointed out. The facts are that he had one complaint, the post had been deleted, and he had posted an apology, right? Those are the facts at that point. It's a little bit more than that, and I think it's important because we have the actual email in the record, and you can read that. And look, counsel's point is well taken. We're not sitting here trying to say that the extent of the spread is something that has to be proven as a matter of fact. What we're talking about here, the issue is not necessarily how far and wide the post had actually spread Saturday and Sunday and Monday. The point is, the issue is whether those school officials were presented with information that would support a reasonable forecast. And when you look at the information that we know that they had before them based on the allegations and then the email that's incorporated in that, then that's the conclusion that the only one reasonably that can be drawn. And look at what the information in that email is. Counsel, counsel, let me come back to the fact that we're at 12 v. 6, and the cases you rely upon are Mahoney, Taylor, West. Those were all decided at the summary judgment stage where the record had been developed. The school had actually developed the record in that case to support their position on disruption. But here, C.G. alleges lack of substantial disruption. And it seems that you're asking to have inferences drawn in favor of the school, but you can't do that at 12 v. 6. The school didn't come forward with affidavits from administrators explaining why they suspended or expelled. You just got, we just got the complaint and a few emails attached to the opposition or to the motion to dismiss, and that's it. Why shouldn't C.G. at least be entitled to have the record developed before the case is thrown out? Because if you look at the face of his allegations and you take them as true, and you look at that email that's referenced and take that as true as well, are we taking as true as allegation that there is no substantial disruption? I would suggest that's not a well-pledged one because it's conclusory and it's rebutted by the information elsewhere in the complaint and in that email. But most importantly, where's the substantial disruption, counsel? Well, the forecast of the substantial disruption. No, let's start with not a forecast yet. And by the way, the forecast case that you're relying upon from the Tenth Circuit was an on-campus incident. It was a summary judgment case, and the school's already on notice that students were throwing around rubber dolls before they shut it down. It's a very different case than the one you're relying, than the one we have here. So where's the substantial disruption based on the allegations in this complaint? All right, so CG alleges that school officials and the police were contacted about the post over the weekend. The reference parent email referenced that the post had been widely circulated throughout the Jewish community over the weekend, was generating fear, anger, and sadness for their family, including their son, who was afraid to come to school. First of all, it doesn't say afraid in the email. It says there was concern. That was the word used. You used afraid. The email says concern. It does use the word fear. It says concern. I think that's the same thing. It says concern. Do you want me to read it to you? Excuse me for interrupting you. Finally expressed concern about returning to school. What does that mean? Where's the disruption? Was there any classroom disruption? Do you have any evidence at this point of classroom disruption? Over the weekend? No, school was not in session. Well, that's what I'm saying. Where's the disruption? Well, the disruption occurs during that following week. Well, the disruption occurred as a result of the administrator's overreaction. I don't know that that's true, but whether it is or isn't, it doesn't matter. Well, sure it does matter because there was no classes were not suspended. There were no demonstrations. There were several conferences held by the administrators discussing it. Other than that, school went on as normal. There was no significant disturbance. I don't know that school went on as normal. I would say that, according to the allegations in the record, what happened is that they made a forecast over the weekend, and then the events of the following week bore out that the principal was right, that they had made a proper judgment call that was defensible and, in hindsight, makes sense. You can say it all you want, but there was no disturbance, significant or otherwise. There were numerous media inquiries. There were other parents that continued to contact the school with concern over the week. There were three people. Four families made a report to the police. I think that's important. That's in the record. And, as well, we get to a week later. A week later, on the following Monday, the school devotes one of their advisory periods, the entire period school-wide, to discussing the post and hate speech. How is that disruptive? Is it disruptive? Having an advisory period to discuss the post, is that really disruptive to the learning environment? Well, it took time away from something else. Isn't that a period that they've allocated for such discussions? Not to discuss disruptive and harassment. No, now you're assuming disruption to establish discussion of disruption. No, I'm saying that the fact that all that happened a week later, I think that that shows that the forecast was reasonable. Okay, that's what I'm trying to make. I guess it leaves us with the question if the school hadn't further disseminated this issue by sending every family in the school district a discussion about the email, whether they would have still been talking about it a week later. You know, there again, I don't think that that's relevant to the test. Because the issue is, think about it this way, C.G. is the one who threw the rock in the pond, and that created the ripples in the pond. The pond is the school and the educational environment. And all of those repercussions made their way into the school environment, or at least the school officials. Well, I would argue that C.J. threw the rock into the school, and that the school decided to throw the rock in itself. You know, we have a situation where had nothing happened with the administration, this Snapchat would have been gone and forgotten long before they discussed it. And unlike Mahoney, they didn't take time away from an algebra class. It was a period that was dedicated to these types of discussion. So I do think it's very different than the facts of Mahoney. I think, Judge McHugh, really what you're saying is, is that somehow the school is being penalized for trying to turn a very difficult situation into a positive and make it a learning. I mean, that's what schools are supposed to do. So I don't think that that should be held against them. I'm not saying they're penalized. I'm saying that it's not a disruption if the school decides to use it as a learning opportunity. Well, and I want to point out a few things about Mahoney before my time expires, because as you had pointed out to counsel, there was no suggestion of violence in that case. When you start looking at the facts of the Mahoney decision, it's very, very different from what we have here. BL's post in that case was merely vulgar. It didn't cause anyone to have any concern. It didn't cause anyone to notify the police. The principal didn't send out a letter to the community reassuring it that the school was safe. There wasn't a plan that needed to be devised to get BL out of their class the next school morning so that they could come into the office and look at getting them out of the learning environment. To start, the very beginning of the day, there was not press coverage that followed about school safety, and they didn't devote an entire period to that. And at most, there was like five to ten minutes of discussion in the one class, as you pointed out. And that's significantly different. BL's Snapchat post concerned a school activity, and the post here did not mention the school. Not explicitly, no. It didn't mention the school, did it? It didn't mention the school, no. But, you know, we have to take into account that the post was posted with classmates. That's in the record. One of the friends of CG who received the post on Snapchat was also a student. That's in the record. And it spread within the community. And again, we can argue about how much did it spread and all of that, but that's not the question. The question is, what was the information that the school officials had when they had to make that judgment call? Because that's what they have to do every single day. And Judge Matheson, you pointed out about some evidence that came in from the expulsion hearing. That's also in the record. And Assistant Principal Ulich said that the post caused, quote, extreme outcry over fear to come to school. Now, how many did they have to prove that that, in fact, was? The point is just that's the information that they had before that. How are we supposed to deal with that? Was that in the complaint? It is in the complaint. It's in paragraph 72. All right, I see that my time is about to expire. If you have a point or two to make, I gave a little extra time, so why don't you wrap up and we'll stop at that point. Well, I appreciate that, Your Honor. I do want to just add that it was suggested that this is not a harassment case. Well, I think it is a harassment case. The nature of those words can't be ignored. Exterminate the Jews. With those three historically charged words, C.G. invoked the Holocaust and presenting hate and violence against Jewish people. It was reasonably foreseeable that that statement would cause fear, concern, anger, sadness, disrupt the learning environment, that it would make its way from the thrift store through the ubiquitous smartphones and wireless networking that we have in this age, a reality that school districts have to deal with on a daily basis. So with that, we thank you and ask that you affirm the district court. Thank you, counsel. Thank you to both counsel. The case will be submitted and counsel are excused. Thank you.